## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**VELVET ANN SAULSBERRY,**          **CASE NO. 5:20-cv-570-TJC-PRL**

    **Plaintiff,**

**v.**

**BILLY WOODS in his official capacity**
**as SHERIFF of MARION COUNTY,**

    **Defendant.**
_____ /

## THIRD AMENDED COMPLAINT

Plaintiff, VELVET ANN SAULSBERRY, hereby sues Defendant, BILLY WOODS, SHERIFF, MARION COUNTY, FLORIDA in his official capacity, and alleges:

## JURISDICTION

1.    This is an action brought under Chapter 760, Florida Statutes, Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §2000e et seq., 42 U.S.C. §1981, 42 U.S.C. §1981a and 42 U.S.C. §1983. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights claim jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

2.     This action is also brought, in part, through 42 U.S.C. §1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured to the Plaintiff by the Constitution and laws of the United States, and by 42 U.S.C. §1988 which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. §1983.

3.     This is an action involving claims which are, individually, in excess of Seventy- Five Thousand Dollars ($75,000.00).

## THE PARTIES

4.     At all times pertinent hereto, Plaintiff, VELVET ANN SAULSBERRY, has been a resident of the State of Florida and was employed by Defendant.  Plaintiff is a member of a protected class because of her race, African American.

5.     At all times pertinent hereto, Defendant, BILLY WOODS, in his Official Capacity as the Sheriff of Marion County, has operated the Marion County Jail (MCJ) and has been organized and existing under the laws of the United States. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above.  Defendant is Plaintiff's employer as it relates to these claims.

2

## CONDITIONS PRECEDENT

6.     Plaintiff has satisfied all conditions precedent to bringing this action.

## STATEMENT OF THE FACTS

7.     Plaintiff began her employment with Defendant in June 2006 and, at all times pertinent to this action, worked as a Detention Deputy at Defendant Sheriff's Marion County Sheriff's Office (MCSO) located at 629 NW 30th Ave. Ocala, FL 34475.

8.     During her employment with Defendant, Plaintiff was subjected to disparate treatment, different terms and conditions of employment, and held to a different standard because of her race.

9.     The disparate treatment came at the hands of specifically but not limited to Sheriff Billy Woods ("Woods") a white male, Major Mike Rolls ("Rolls") a black male, Major f/n/u Bowen ("Bowen") a white male, Captain Ron Burnett ("Burnett") a white male, Captain f/n/u Durham ("Durham") a white male, Captain f/n/u Walters ("Walters") a white male, Lieutenant Alyshia Chisholm ("Chisholm") a black female, Lieutenant Galen Priest ("Priest") a white male, Sergeant f/n/u McNealy ("McNealy") a white male, Sergeant f/n/u Land ("Land") a white male, Sergeant Brenda Flaherty ("Flaherty") a white female, and Officer f/n/u Grantham ("Grantham") a white female.

3

## BACKGROUND

10.     Plaintiff had had a long-standing problem with Lt. Priest stemming back to around the 2013 time period when he had falsified a complaint against her, claiming that she engaged in the dereliction of duty, as discussed below.

11.     Priest made it very clear that he did not like Plaintiff, which she believed was based on her race as he did not treat white employees as poorly as he treated Plaintiff and she suspected that he specifically took actions to interfere with her ability to be promoted.

12.     As background, in 2014, Master Sergeant Chapman, who is white, recommended that Plaintiff be promoted to the rank of Corporal.   His recommendation was written into Plaintiff's employee evaluation on June 5, 2014.

13.     Plaintiff later found out her employee evaluation was tampered with by Priest in June, 2014. Priest was not Plaintiff's direct supervisor at the time of the employee evaluations in 2014, but he went out of his way to reach out to Plaintiff's direct supervisor, Flaherty, about Plaintiff.

14.     With the consent of Flaherty and Major Rolls, Priest was permitted to amend Plaintiff's employee evaluation even though it had already been signed and approved.

15.    Priest falsely asserted in Plaintiff's 2014 revised employee evaluation, dated June 28, 2014, that she attempted to interfere with an inmate, Gwendolyn Turner's, access to medical attention on November 3, 2013.

16.    The allegation caused Plaintiff to lose out on a promotion to Corporal for a period of roughly six (6) months in the 2014 time period while Defendant's supervisors investigated the allegations.

17.    In 2014, Plaintiff filed a grievance against Priest for the false allegation.

18.    Priest was never disciplined for making the false allegation against Plaintiff because there was a longstanding and established pattern and practice of discrimination within Defendant where white employees were permitted to discriminate against black employees without consequence.

19.    Priest, for some time, let up on his mistreatment of Plaintiff because word of Plaintiff's grievance on Priest reached the desk of then Sheriff Emery Ganey, black male, who preceded Defendant Woods.  Plaintiff met with Sheriff Gainey and told him about the false allegations by Priest and that she had not been promoted to Corporal due, at least in part, to these allegations by Priest and that she filed a grievance against him.

20.    Sheriff Gainey had been appointed to the position of Sheriff in May, 2016, taking over for then Sheriff Blair, and Gainey did not tolerate the conduct by

5

Priest and others. Gainey actually warned upper management and staff that there would be consequences if their behavior continued in the workplace.

21.     On January 3, 2017, Defendant Billy Woods was sworn in as Sheriff of Marion County and Plaintiff's work environment was not policed like it was under Sheriff Gainey.   Once Woods was elected, Plaintiff's co-workers and supervisors returned to their earlier discriminatory practices shortly after Woods became Sherriff.

22.     This longstanding pattern and practice translated into promotions and disciplinary actions within Defendant. By way of example, Plaintiff observed over the course of her time working for Defendant that white employees were given preferential treatment when it came to disciplinary actions for misconduct. For example, Deputy Muller, a white male, was not terminated but permitted to resign after an inmate by the name of Bagley successfully escaped from Defendant's facility. Captain Walters, a white male, who was supervising Muller at the time, was sent to work at the inmate farm for a time but continued to receive promotions. Deputy French, a white male, brought his firearm into Defendant's Suicide Precautions unit and proceeded to strip search inmates per protocol.  Firearms were prohibited in the jail.

23.     Deputy French was not fired for this error even though it was a clear terminable offense given the substantial safety risk bringing a firearm into

6

Defendant's facility poses. Deputy Miley, a white female, and Deputy Brown, a white male, were patrol deputies who were involved in the fatal shooting of a Hispanic male suspect. Specifically, Miley shot the suspect in the back as he was fleeing and Brown tased the suspect repeatedly. Despite a massive lawsuit that made the local papers from this incident, neither Deputy was fired. In lieu of termination, they were placed into Defendant's jail facility as correctional officers.

24.    Deputy Miley was even promoted to the position of Corporal with substantially greater ease than Plaintiff despite being the direct cause of a massive lawsuit with Defendant.  In contrast, Derrick Womack, who is black and married to a white woman, was accused of and disciplined for having too many use of force reports but Womack had been called more than other white employees to respond to altercations.  Jon Wilkerson, who is black, quit working for the Defendant after multiple disciplinary actions for having too many uses of force, like Womack, and had been directed more than white employees to respond to inmate altercations. They were called "too aggressive" by the white management.

25.    Another instance supporting Defendant's discriminatory work culture was an incident that occurred in November 2013 in which Plaintiff was assaulted by inmate Sherrell Stephens ("Stephens") and a white coworker, Deputy Dorothy Grantham (white) watched Plaintiff get assaulted but took no action to intervene.

7

26.     Further, despite an alert to the facility that Plaintiff was being attacked, McNealy (white) and Landt (white) walked calmly to Plaintiff, with no exigency, even though she was fighting for her life with an inmate.

27.     Plaintiff ultimately called Grantham out for effectively abandoning a fellow officer and lying that she couldn't clearly see what was going on from her viewpoint at the time of the incident.

28.     Despite the clear video evidence found by Carter (white), Rolls (black) and others in management, that Grantham's account was inaccurate, she was allowed to write a second report to correct her lie as the video evidence clearly showed that she could see what was happening to Plaintiff.

29.     Like Priest, Grantham was never disciplined for her lie or disregard for the life of her fellow Deputy.

30.     It became clear to Plaintiff following these incidents that white employees within Defendant were held to substantially different and lower standards in comparison to her when it came to the consideration of disciplinary records in promotions and when it came to the protection of black deputies like Plaintiff.

31.     Priest put forth substantial effort in mistreating Plaintiff in the workplace at the expense of the inmates under his supervision over time and into the 2018 time period.

32.     This background of interactions with Priest and others led Plaintiff to believe that Priest interfered with her promotion in the 2017/18 time period.

## CURRENT EVENTS SUBJECT TO THIS LAWSUIT- FAILURE TO PROMOTE AND TERMINATION

33.     In 2017, Plaintiff took the Sergeant's examination for promotion and passed.

34.     Later that year in 2017, but before the promotions, Defendant Sheriff sent a request to staff members to make recommendations for candidates for promotions to the position of Sergeant. Plaintiff received a letter from the MCJ Staff Psychiatrist, Dr. William Whitman. He commended Plaintiff's competence in handling inmates with altered mental statuses and maintaining their appropriate care.

35.     In both 2017, and again in 2018, Plaintiff expressed her interest in promotion to Sergeant as Defendant was in the process of selecting two Corporals for promotion to Sergeant. Plaintiff was a qualifying Corporal at that time.

36.     In early September 2018, Defendant announced that the employees who would be promoted to the rank of Sergeant were Deputies Konopinski and Landt, both of whom are white males and had fewer years of services with Defendant as well as less education when compared to Plaintiff.

37.     Despite passing the exam and being imminently more qualified for the positions, Landt and Konopinski, were promoted rather than Plaintiff.  Both Landt

and Konopinski only had high school degrees and worked less time with Defendant Sheriff than Plaintiff.  Plaintiff, on the other hand, had a Bachelor's Degree from the University of Florida and had worked longer with the Defendant than they had. She has received a medal of commendation for saving an inmate's life during his attempt to commit suicide and three Eagle Eye Awards for being keenly observant and always vigilant.

38.   On September 5, 2018, Plaintiff had a meeting with Durham and Sergeant f/n/u Foiles, a white female, to inquire as to the reason she had not been selected for promotion to Sergeant even after being recommended for the promotion by Dr. Whitman.

39.   Ultimately, Captain Durham and Lt. Chisholm made the decision to promote Landt and Konopinski over Plaintiff but their promotions had to be approved by the Sheriff.

40.   When Plaintiff spoke with Chisholm about why she was not promoted, it became apparent to Plaintiff that Chisholm was trying to evade the question and merely said that "things change" and that she "could not have her feet held to the fire about anything." When Plaintiff attempted to clarify her answer, Chisholm refused to answer further and only said she did whatever the captains or higher ups told her to do. Chisholm's statement is an indicator of Chisholm's role as the

10

complicit black supervisor who does the bidding of a majority white management to avoid liability for their employment decisions.

41.     Prior to the promotions of Landt and Konopinski, in May 2018, Plaintiff advised the Sheriff that she was seeking a promotion to the position of Sergeant so he was aware of her attempt to be promoted prior to his approval of Landt and Konopinski for the Sergeant promotions.

42.     Plaintiff suspected that Lt. Priest had interfered with her employment again like he did in 2014, discussed above.

43.     Plaintiff claims in this case that the failure to promote her was an act of race discrimination.

44.     Even after filing her grievance against Priest in 2014 for changing her evaluation, Defendant, through its management staff, still permitted Priest to make changes to Plaintiff's employee evaluations. Each time Priest made an amendment to one of Plaintiff's evaluations, her scores became worse and were lowered. These activities by Priest were always approved by Plaintiff's supervisors which had a negative effect on Plaintiff's attempt to be promoted.

45.     On September 19, 2018, Plaintiff was assigned to observe inmate Brenda Crews ("Crews") at The Centers Mental Health Facility ("Centers") in Ocala, Fl.

46.     The Centers serves as the designated mental healthcare provider for the inmates at the MCSO jail.

47.     Crews was assigned to a cell in the facility that had two doors. One was the front door that led into a common area, the other was the rear door that exited to a secured hallway that required key fobs to open the exit to said hallway. Two deputies were assigned to the secured rear hall, Deputy f/n/u Strickland and Deputy Pete Medico, both of whom are white.

48.     Plaintiff was assigned to a locker room adjacent to the front door of Crews cell to provide Plaintiff with ease of access to Crews' front door to conduct observations.

49.     At The Centers, the deputies were expected to draft observation notes on inmates every 15 minutes. While Operations Directive 6630.20 requires deputies to observe inmates every thirty minutes, Plaintiff received a memo from Lieutenant Nix back on November 30, 2017, requiring detention deputies to document their observations in their logbooks every 15 minutes while at The Centers specifically.

50.     Plaintiff complied with this directive and conducted observations of Crews throughout her shift within 15-minute intervals. Crews had been bashing at the door and screaming but eventually calmed down during Plaintiff's shift.

51.     At approximately 5:10 p.m., Crews opened the rear door of her cell while Plaintiff was reviewing her logbook and entered the secured hallway.

12

Strickland noticed Crews entered the hallway within a 2-minute period. Strickland and Medico were in the secured hallway watching another inmate. The rear door to Crews cell was closed completely upon exiting her cell.

52.     Upon being notified by Deputy Strickland that inmate Crews had just stepped into the secured hallway into his field of vision, Plaintiff and Strickland immediately took action. Together, Plaintiff, Strickland, and Medico coordinated with staff members at The Centers to return Crews to her cell. Crews had no means of escaping the facility from the secured hall as a key fob in the possession of the deputies was the only way to open the hallway doors.

53.     Plaintiff later learned that neither of the doors to Crews' holding cell was secured with a deadbolt mechanism. This allowed her to use pieces of a flattened drinking cup to open the lock latch mechanism on her rear cell door.

54.     Because Crews entered a secured hallway, there was no way for her to leave the facility.

55.     Plaintiff later learned that this was not the first time Crews had improperly exited this particular cell. Deputy Kimberly Krause ("Krause") had a similar experience with Crews who used the same method to exit her cell. During Krause's incident, Crews opened the front door to her cell which did allow for a path to exit the facility. Krause was not present directly outside of the inmate's cell at the

time the inmate exited the front door of her cell. Krause, with the assistance of staff, subdued Crews and returned her to the cell.

56.    Krause was never disciplined for this incident.

57.    Immediately after this incident with Crews, Plaintiff followed the proper chain of command and contacted the Sergeant-On-Duty, Sergeant f/n/u Nelson ("Nelson"). Plaintiff explained to Nelson what had happened at The Centers, but Nelson was not bothered about what happened as Crews had successfully done the same thing to Krause.

58.    Later, Plaintiff reported the incident to her direct supervisor, Flaherty, when she came on shift. Plaintiff reported that The Centers door security for Crews' cell was inadequate and that something ought to be done about it.

59.    Flaherty arranged a meeting with Chisholm and invited Plaintiff. When Plaintiff began to explain what happened, Chisholm accused Plaintiff of lying and said that she was reporting the incident to Durham so that an investigation could be conducted against Plaintiff.

60.    Plaintiff was aware that Durham had been notified about the incident with Krause and was expecting him to deny an Internal Affairs investigation since Krause never had one.

14

61.    At some later point after she was notified of her termination, Plaintiff learned that Durham had assigned Priest to collected the evidence that was later used to implicate Plaintiff in wrongdoing regarding the Crews incident.

62.    Later Plaintiff was called into Chisholm's office and Chisholm notified Plaintiff that Internal Affairs (IA) wanted to talk to her. Plaintiff went to the office of the IA investigator assigned to the incident and realized that she was going to be interviewed about the Crews incident by Investigator Johnson ("Johnson"), a white female.

63.    During the investigation, Johnson focused on two things: whether Plaintiff was looking at her logbook or her Bible when Crews exited her cell and whether Plaintiff lied about the amount of time that Crews was outside of the cell with no supervision.

64.    Upon thorough review of the security footage from The Centers, Johnson concluded that Plaintiff was looking at her Sheriff's Logbook for a period of 1 minute and 42 seconds. Sometime in that timeframe is when Crews escaped.

65.    Johnson disclosed to Plaintiff the reason she was concerned about the amount of time Crews was out of her cell was because Deputy Medico wrote down different time frames for Crews exit from the cell.

66.    The security footage confirmed Plaintiff's story and that the times listed by Medico were heavily exaggerated and not consistent with the time the incident

15

occurred as shown on the security camera. In fact, his report was off by several hours.

67.     Plaintiff's incident report, on the other hand, was only off by a few minutes.

68.     Medico, who is white, never received any discipline for the errors in his incident report which were proven to be false by the security footage.

69.     Nonetheless, Defendant's management later asserted that Plaintiff was carrying unauthorized reading materials [The Bible] on shift. Ironically, it was Defendant Sheriff or his secretary who distributed Bibles to staff at work during working hours.

70.     The Center's staff member, Judy Turner ("Turner") was also interviewed by Johnson. Turner's explanation of the incident was consistent with Plaintiff's. Turner stated that Plaintiff tried to troubleshoot ways to ensure the rear cell door would remain shut once Crews was returned to her cell. Turner also explained that after the incident, Crews opened the rear door multiple times with different pieces of cups she was given with her meals.

71.     To Plaintiff's knowledge, none of the other detention deputies assigned to monitor Crews were reprimanded for any of the prior or subsequent incidents where Crews exited her cell by jimmying open her cell doors.  The Krause incident with Crews occurred before the incident that Plaintiff had with Crews.

16

72.     During the investigation, Judy Turner told Investigator Johnson about the other incidents in which Crews was successful in getting out of her cell both before and after the incident with Plaintiff but Plaintiff does not know the identity of these officers other than Krause, discussed above.

73.     On September 24, 2018, while Plaintiff was still under investigation for the Crews incident, Chisholm called Plaintiff to Medical Pod A Section and told her that she was no longer permitted to use the restroom after briefing and on the way to her post. Chisholm also told Plaintiff she was not allowed to drive her vehicles around the building to the front booking parking lot. All other deputies were still permitted to engage in these activities save for Plaintiff.

74.     While Chisholm is a black female, Plaintiff understood that Chisholm saw Plaintiff as a threat to her authority within Defendant's management because Plaintiff was fantastic at her job. As such, Chisholm specifically picked on Plaintiff to ensure that she, Chisholm, as a black female, would continue to be treated favorably by the other white individuals within management who were responsible for the culture of preferential treatment and lax standards for white detention deputies.  Chisholm "went along to get along" and to curry favor with her white supervisors.

75.     On November 8, 2018, Sheriff Woods authorized a Discipline Matrix Form on the basis that Plaintiff committed a Dereliction of Duty under Operations

17

Directive 1068.04 A (3) and violated Operations Directive Floor Rules 6091.15(A) and (F) with the recommended discipline of Two-Day Suspension – Termination.

76.     Defendant's justification for certifying these violations was exclusively on the basis of the September 19, 2018, incident involving inmate Crews at The Centers.

77.     Plaintiff never violated any of the procedures listed in the Discipline Matrix Form because she was acting in compliance with Operations Directive 6530.10 and the supplemental security instructions provided to Plaintiff by Nix on November 30, 2017, when the incident occurred.

78.     Plaintiff was then instructed to meet with Captain Walters ("Walters") and Major Bowen ("Bowen"). Walters and Bowen informed Plaintiff that Sheriff Woods recommended Plaintiff's termination as discipline for her actions on September 19, 2018.

79.     When Plaintiff inquired about what she specifically did to support her termination, Walters and Bowen asserted that Plaintiff's actions amounted to "gross negligence that posed an extremely high safety risk for numerous individuals." Plaintiff was then summarily terminated on the basis of her race.

80.     Plaintiff claims in this case that her termination was an act of race discrimination.

81.    Plaintiff was devastated by her termination and the malicious mischaracterization of what happened at The Centers on September 19, 2018. Time and time again throughout her employment, white Detention Deputies like Krause, Priest, Grantham, Martinez, Miley, Medico, Brown, French, Muller and others were given a pass for behaviors that should have amounted to discipline and in some instances termination. Two of the individuals listed here killed a human being, caused a lawsuit and still had their jobs.

82.    Even Walters, the white male who informed Plaintiff she was being terminated, served as the Jail Watch Commander at the MCSO Jail in 2011. Under Walter's watch, a juvenile defendant named Yarnel Rashard Bagley successfully escaped from the facility. Walters kept his job.

83.    Meanwhile Plaintiff was terminated because an inmate exited a cell at a mental health facility, with substantially fewer security protocols, into a secured hallway from which she could not escape.  She was being held in a cell with locking mechanisms and construction that Plaintiff had absolutely no control over.

84.    Despite substantial protest by Plaintiff and even her constant advisement to Chisholm and others regarding the safety and security failures within MCSO and even The Centers, Plaintiff was terminated.

85.     Plaintiff has retained the undersigned to represent her interests in this cause and is obligated to pay a fee for these services.  Defendant should be made to pay said fee under the statutes referenced above.

## COUNT I
## RACE DISCRIMINATION
### (Against Defendant SHERIFF)

86.     Paragraphs 1 through 85 are re-alleged and incorporated herein by reference.

87.     This is an action against Defendant for discrimination based upon race brought under 42 U.S.C. §2000e et seq.  This is a disparate treatment claim.

88.     Plaintiff has been the victim of discrimination on the basis of her race in that she was treated differently than similarly situated white employees of Defendant and has been subject to hostility and poor treatment on the basis, at least in part, of her race. This has impaired Plaintiff's rights by subjecting her to different standards in the enjoyment of all benefits, privileges, terms, and conditions of her employment with Defendant.

89.     Specifically, Plaintiff claims in this case that the failure to promote her in 2018 and her termination are adverse actions for which she seeks recovery.

90.      Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and

20

inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

91.    Furthermore, Defendant knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

92.    Defendant's known allowance and ratification of these actions and inactions created, perpetuated, and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

93.    In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a race-based nature and in violation of the laws set forth herein.

94.    The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant

95.    The events set forth herein led, at least in part, to discipline, the failure to promote Plaintiff and her termination.

96.    Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon race in violation of 42 U.S.C. §2000e et seq.

97.    As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and

future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits.  These damages have occurred in the past, are permanent and continuing.  Plaintiff is entitled to injunctive relief and reinstatement.

## COUNT II
## RACE DISCRIMINATION - CHAPTER 760
### (Against Defendant SHERIFF)

98.    Paragraphs 1 through 85 are realleged and incorporated herein by reference.

99.    This is an action against Defendant for discrimination based upon race brought under Chapter 760, Florida Statutes.  This is a disparate treatment claim.

100.    Plaintiff has been the victim of discrimination on the basis of Plaintiff's race in that Plaintiff was treated differently than similarly situated employees of Defendant who are white and has been subject to hostility and poor treatment on the basis, at least in part, of Plaintiff's race.

101.    Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.   Furthermore, Defendant knowingly

22

condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

102.   Defendant's known allowance and ratification of these actions and inactions created, perpetuated and facilitated an abusive and offensive work environment within the meaning of the statutes referenced above.

103.   In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were of a race-based nature and in violation of the laws set forth herein.

104.   The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.  The events set forth herein lead, at least in part, to adverse actions against Plaintiff.

105.   Specifically, Plaintiff claims in this case that the failure to promote her in 2018 and her termination are adverse actions for which she seeks recovery.

106.   Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon race in violation of Chapter 760, Florida Statutes.

107.   As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front

23

pay, interest on pay, bonuses, and other benefits.  These damages have occurred in the past, are permanent and continuing.  Plaintiff is entitled to injunctive/equitable relief and reinstatement.

## COUNT III
## <u>VIOLATION OF FOURTEENTH AMENDMENT RIGHT OF EQUAL PROTECTION</u>
### (Against Defendant SHERIFF)

108.    Paragraphs 1 through 85 above are incorporated herein by reference. This count is pled in the alternative.

109.    This count sets forth a claim against Defendant SHERIFF for violations of Plaintiff's right to equal protection under the Fourteenth Amendment to the United States Constitution, brought through 42 U.S.C. §1983. These violations were of the type and character as to which any reasonable person would be aware. Defendant is a person under the laws applicable to this count.  This is a disparate treatment claim.

110.  Defendant   SHERIFF,   acted   to   violate   Plaintiff's   Fourteenth Amendment right to equal protection, actionable under 42 U.S.C. §1983, in that she was treated differently from other similarly situated white men and women by a state actor in the absence of any rational basis for such differential treatment.

111.  Plaintiff  has  been,  as  set  forth  in  part  above,  singled  out  for mistreatment  which  has  led  to  the  failure  to  promote  and  then  to  Plaintiff's

24

termination, as described in part herein, which have not happened to other similarly situated white men and women, and otherwise treated by Defendant SHERIFF in a differential and less favorable manner as compared to similarly situated white men and women, without a rational basis for such denial and differential treatment.

112.   The actions taken against Plaintiff, i.e., the failure to promote her and her termination, as set forth in part above, were taken by Defendant SHERIFF and Priest, Durham, and Chisholm, all of whom were final policymakers for the Defendant Sheriff in the actions that they took against Plaintiff.

113.   Defendant SHERIFF is a person under the laws applicable to this action.

114.   Defendant SHERIFF participated in a custom, policy and practice of singling Plaintiff out for disparate treatment on the basis of her race as set forth in part above.

115.   Defendant SHERIFF was also deliberately indifferent to the training received by Durham, Priest, Chisholm, and other agents, officers, and employees and has condoned and/or ratified their actions which violate the Equal Protection Clause of the Fourteenth Amendment.

116.   Additionally, Defendant SHERIFF, Priest, Chisholm and Durham, after notice of the constitutional violations alleged herein, officially sanctioned these actions by refusing to discipline the officers, employees and agents, which sanctions

and refusals established one or more policies, by final policymakers, primarily the Sheriff, Priest, Durham and Chisholm, that directly or indirectly resulted in the violation of Plaintiff's constitutional rights.

117.   Instead, Defendant SHERIFF and the persons identified above ensured that incentives were given to officers who voted against Plaintiff to ensure that his termination decision would be rubberstamped by a review board in upholding her termination. The actions by Defendant SHERIFF occurred under color of state law, and is actionable under 42 U.S.C. §1983.

118.   All persons who took action against Plaintiff as identified herein were delegated final policymakers in the adverse actions affecting Plaintiff including Defendant Sheriff, Durham, Priest and Chisholm.

119.   As a direct and proximate result of Defendant SHERIFF's actions, set forth in part above, Plaintiff has been injured and suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, along with other tangible and intangible damages.  These damages have occurred in the past, are occurring at present, and will likely continue into the future.  Plaintiff is entitled to injunctive relief including reinstatement.

**COUNT IV**
**VIOLATION OF 42 U.S.C. §1981 BROUGHT THROUGH 42 U.S.C. §1983**
**FOR RACE DISCRIMINATION**
**(Against Defendant SHERIFF)**

120.   Paragraphs 1 through 85 above are incorporated herein by reference. This count is pled in the alternative.

121.   This count sets forth a claim against Defendant SHERIFF for violations of Plaintiff's rights under 42 U.S.C. §1981 brought through 42 U.S.C. §1983. These violations were of the type and character as to which any reasonable person would be aware. Defendant is a person under the laws applicable to this count.

122.   Defendant SHERIFF, acted to violate Plaintiff's right to be free from race discrimination under 42 U.S.C. §1981, actionable under 42 U.S.C. §1983, in that she was treated differently from other similarly situated white men and women by a state actor in the absence of any rational basis for such differential treatment.

123.   Plaintiff has been, as set forth in part above, singled out for mistreatment which has led to the failure to promote and then to Plaintiff's termination, as described in part herein, which have not happened to other similarly situated white men and women, and otherwise treated by Defendant SHERIFF in a differential and less favorable manner as compared to similarly situated white men and women, without a rational basis for such denial and differential treatment.

27

124.   The actions taken against Plaintiff, i.e., the failure to promote her and her termination, as set forth above, were taken by Defendant SHERIFF and Priest, Durham, and Chisholm, all of whom were final policymakers for the Defendant Sheriff in the actions that they took against Plaintiff.

125.   Defendant SHERIFF participated in a custom, policy and practice of singling Plaintiff out for disparate treatment on the basis of her race as set forth in part above.

126.   Defendant SHERIFF was also deliberately indifferent to the training received by Durham, Priest, Chisholm, and other agents, officers, and employees and has condoned and/or ratified their actions which violate 42 U.S.C §1981.

127.   Additionally, Defendant SHERIFF, Durham, Priest and Chisholm, after notice of the violations alleged herein, officially sanctioned these actions by refusing to discipline the officers, employees and agents, which sanctions and refusals established one or more policies, by final policymakers, primarily the Sheriff, Durham, Chisholm and Priest, that directly or indirectly resulted in the violation of Plaintiff's rights.

128.   Instead, Defendant SHERIFF, Priest, Durham, and Chisholm, ensured that incentives were given to review board members to vote against Plaintiff to ensure that his termination decision would be rubberstamped by the review board in

upholding Plaintiff's termination. The actions by Defendant SHERIFF occurred under color of state law, and is actionable under 42 U.S.C. §1983.

129.   All persons who took action against Plaintiff as identified herein were delegated final policymakers in the adverse actions affecting Plaintiff including Defendant Sheriff, Durham, Priest and Chisholm.

130.   As a direct and proximate result of Defendant SHERIFF's actions, set forth in part above, Plaintiff has been injured and suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, along with other tangible and intangible damages.  These damages have occurred in the past, are occurring at present, and will likely continue into the future.  Plaintiff is entitled to injunctive relief including reinstatement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

    (a)   that process issue and this Court take jurisdiction over this case;

    (b)   that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

29

(c)     enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d)     enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e)     enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f)     award Plaintiff interest where appropriate; and

(g)     grant such other further relief as being just and proper under the circumstances including reinstatement.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Respectfully submitted,


/s/ Marie A. Mattox
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P.A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone:  (850) 383-4800
Facsimile:   (850) 383-4801
ATTORNEYS FOR PLAINTIFF

30

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served upon all counsel of record by CM/ECF this 21st day of October, 2022.

/s/ Marie A. Mattox
Marie A. Mattox

31