# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

VELVET ANN SAULSBERRY,

    Plaintiff,

v.

    Case No. 5:20-cv-570-TJC-PRL

BILLY WOODS, in his Official
Capacity as Sheriff of Marion
County,

    Defendant.

_____

# **O R D E R**

**THIS CASE** is before the Court on Defendant's Motion for Final Summary Judgment, which has been fully briefed. Docs. 81, 88, and 91. Plaintiff Velvet Ann Saulsberry has sued Defendant Billy Woods ("Sheriff") alleging four counts of race discrimination related to her prior employment and termination. Doc. 47.

    **I.**    **BACKGROUND**

        A. <u>Employment Overview</u>

The Sheriff hired Saulsberry, a Black female, as a community policing trainee in 2006.[1] Saulsberry did not complete the training program and

---

[1] The Court generally refers to the Defendant as Sheriff, because he has been sued in his official capacity. Billy Woods was sheriff during 2016-18, the

transferred to corrections to be a Detention Deputy.[2] Doc. 80-1 at 4–6. The Sheriff promoted Saulsberry to corporal in 2016. Doc. 86-27 ¶ 3.

### B. Saulsberry's Application for Sergeant (Failure to Promote)

In 2017 and 2018, Saulsberry (and 38 others who passed the exam) were placed on an eligibility list for promotion to sergeant. Doc. 80-1 at 35; see Doc. 81 at 5. In addition to passing the exam, the job requirements included: (1) five years in law enforcement or corrections (at least three with the Marion County Sheriff's Office), (2) a two-year degree or equivalent in criminal justice,[3] and (3) being recommended by their immediate supervisor. Doc. 80-1 at 37–39. There were four promotions from the list: two white officers, William Konopinski and Evan Land, and two Black officers, Tunisa Donely and Timothy Grimes. Doc. 86-27 ¶ 9; Doc. 80-1 at 26–29, 31, 34.

Saulsberry alleges her education and experience make her more qualified than either Konopinski or Land. Doc. 86-27 ¶¶ 9–10. Saulsberry had more than ten years of experience with the Sheriff, more than Konopinski or Land. Id.

---

time related to Saulsberry's claims here, but not when she was hired.

[2] Both community police officers and correctional officers report to the Sheriff. See Doc. 80-1 at 4.  In 2008, Saulsberry attempted again to complete training for community policing but did not complete the training and transferred back to corrections. Doc. 80-1 at 7.

[3] There was also required training, not at issue here.

Saulsberry had a bachelor's degree in criminal justice, but neither Konopinski nor Land had a college degree. Id.

None of Saulsberry's supervisors recommended her for promotion, but she was recommended by a staff psychiatrist, Dr. Whitman. See Doc. 86-28 at 34–35 [4]; Doc. 86-27 ¶ 12. In addition, Saulsberry had received a medal of commendation for saving an inmate's life and several "Eagle Eye" awards for being observant and vigilant. Doc. 86-27 ¶ 11.

### C. Saulsberry's Termination

On September 19, 2018, Saulsberry was assigned to provide security for a female inmate at The Centers Mental Health Facility.[5] Doc. 86-27 ¶ 14. The inmate was assigned to a room with two doors (on opposite sides of the room), and Saulsberry was stationed outside one door, able to observe the room through a glass pane in the door. See Doc. 86-4 at 2. While Saulsberry was on duty, the inmate picked the lock of the other (back) door and exited into a secure hallway. Doc. 80-8 (synced video) (starting at 17:33); Doc. 86-27 ¶ 16. After about one minute, Saulsberry was alerted the inmate was outside the room. Id. Saulsberry entered the room and was assessing how the inmate was able to exit

---

[4] Page number references are to ECF page number, which do not always match page numbers of an exhibit itself.

[5] The Centers is used for mental health referrals. It and the jail are separate facilities.

through a locked door, while a Centers employee entered the hallway and returned the inmate to her room. Id.

The Sheriff's investigation was conducted by Inspector-Sergeant Kristin Johnson. The investigation included review of three video streams (showing the inmate's room, hallway, and area where Saulsberry was stationed), Saulsberry's logbook entries, Saulsberry's incident report, and interviews with Centers staff and other officers involved.[6] Doc. 86-21 at 11–15. It substantiated three violations of policy or procedure: (1) failure to remain alert, (2) falsification of records, and (3) reading an unauthorized book.[7] Doc. 86-21 at 15. The recommended discipline (based on a scoring matrix) ranged from a two-day suspension to termination.[8] Doc. 86-21 at 18. The Sheriff chose to

---

[6] The video reviewed covered one hour, from 17:00 to 18:00. The inmate exited the room at 17:33:59. Doc. 80-8.

[7] The failure to remain alert is a violation of Employee Regulations-Jail 6091.15(F), and the investigation noted Saulsberry did "not remain[] alert to the actions of Inmate," was "wearing earbuds," and did "not maintain[] observation of Inmate." Doc. 86-3 at 6. The falsification of records violated Code of Conduct 1068.04(A)3, and the investigation cited Saulsberry's incident report and logbook for "failing to properly document accurate times, supervisor notifications, and log entries." Id. The unauthorized reading material violated Employee Regulations-Jail because she was "reading an unauthorized book while on duty." Id.

[8] The Sheriff has a point system for discipline. The three violations were cumulatively assessed fifty points. Doc. 86-21 at 18.

4

terminate Saulsberry, effective November 8, 2018.[9] Id. Saulsberry appealed the termination, but it was upheld. Doc. 80-1 at 24.

As described below, Saulsberry challenges the investigation's conclusion and alleges others engaged in similar behaviors without discipline or termination.

### a. Failure to Remain Alert

Saulsberry was responsible to continually observe the inmate and make logbook entries every fifteen minutes.[10] See Doc. 86-8 at 2. While Saulsberry was stationed outside one of two doors to the inmate's room, the inmate (in less than twenty seconds) used part of a cup to pick the lock to the back door and leave the room. Doc. 80-8. Just over a minute later, another deputy (Alex Strickland, assigned to observe an inmate in the secure hallway) and a Centers employee entered the room where Saulsberry was stationed.[11] Id. Saulsberry

---

[9] Clint Bowen, Chief of the MCSO Detention Bureau, recommended termination. See Doc. 80-10.

[10] An operational memo from November 30, 2017, regarding "Security at The Centers," stated "[a]t no time will the detention deputy be permitted to be away from the secured door to the seclusion area unless properly relieved for a restroom break." Doc. 86-8 at 2.

[11] There were two officers assigned to observe a male inmate in the hallway, Strickland and Pete Medico, so one could leave and alert Saulsberry while the other remained.

removed earbuds from her ears and entered the inmate's room, along with the Centers employee. Id.

While the inmate was picking the lock and in the hallway (approximately a minute and a half), Saulsberry appears to be looking at the logbook. Id. Strickland's incident report states he "went to tell Deputy Saulsberry that her inmate was on the male side. Upon telling her the situation she had her head buried down and a pair of headphones in her ears. Saulsberry was surprised and in denial" when she learned the inmate had exited through the back door. Doc. 86-4 at 3. There is no indication on the video Saulsberry was aware the inmate had left the room until Strickland entered the room where Saulsberry was stationed. See Doc. 80-8. Statements from Centers employees support that Saulsberry had a cell phone, had earbuds, was reading her Bible, was not attentive, and that Saulsberry seemed surprised when Strickland informed her the inmate had left the room. See Doc. 86-3 at 4.

Johnson's review of the hour-long video showed Saulsberry took something in and out of her ears, and Saulsberry left her station twice to stand at the front desk and interact with Centers staff there. Doc. 86-3. The front desk and property room where Saulsberry was stationed were adjacent, and visible to each other through a clear partition.[12] See Doc. 80-8. The inmate did not exit

---

[12] Saulsberry describes the room as a storage closet. Doc. 86-27 ¶ 19.

6

the room while Saulsberry was at the front desk, but Saulsberry did not maintain constant observation of the inmate while she was at the front desk.[13] Id.

Saulsberry alleges Strickland and Pete Medico (both assigned to observe a male inmate in the hallway), also had personal cell phones and earbuds the date of the incident, but neither was investigated nor disciplined. Doc. 86-27 ¶ 45. She alleges it was common for officers to bring personal cell phones and ear buds for assignments at the Centers. Id. ¶ 46. Further she alleges officers "received business calls on our personal cell phones while at The Centers because the Sheriff issued phones were not reliable." Id.

### b. Falsification of Records

Saulsberry completed an incident report five days later, on September 24, 2018. It states: "at approximately 1710 hours while on post at the centers in observance of inmate [] [she] was stationed outside the locked front door of [inmate's] cell and observing her through what is an approximately four inch wide window set in the door." Doc. 86-4 at 2. Saulsberry "glanced away from [inmate]and at her the [sic] bible she brought on post. The moment [she] looked

---

[13] Standing at the front desk, Saulsberry could see the door to the inmate's room but could not see into the room itself. The front desk had a monitor of the inmate's room, but this was only visible to Saulsberry by leaning over the counter (and the video does not show that occurred).

away from inmate [] [she] heard the cell door click. As [she] was looking back into the cell to see that inmate [] was not in her cell as she had just stepped out the back door of cell to where the male inmate was with Deputy Strickland." Id. When Saulsberry was asked about her claim in the incident report that she heard the inmate leaving the cell, Saulsberry said the sound she heard alerting her must have been when Stickland entered the property room to alert her to the incident. Doc. 86-3 at 5.

Saulsberry's 17:30 log entry indicates "Inmate was able to open her cell door to the male side with drinking cup, made Sgt. Phillips aware." Doc. 86-9 at 22. Johnson interviewed Phillips, who denied Saulsberry contacted her about the incident. Doc. 86-3 at 3. Saulsberry testified she was confused about who she notified, it was Sergeant Nelson, not Phillips. Doc. 86-28 at 89.

Strickland and Medico did incident reports, and both have incorrect times. Strickland's report states the incident occurred at 17:10, while Medico indicates it occurred at 02:45. Doc. 86-4 at 2–3.

### c. Reading Unauthorized Material

Although Saulsberry's incident report says she was reading a Bible when the inmate exited the room, the investigation merely indicates she was reading, and it appears she was reviewing the logbook. Compare Doc. 86-4 at 2 with Doc. 86-3 at 3. Saulsberry admits to reading her Bible at other times, including while

on duty. Doc. 86-28 at 90, 109–10, 118. Saulsberry contends this was not unauthorized material because the Sheriff distributed the Bible. Doc. 86-27 ¶ 43; Doc. 86-28 at 90, 109–12. Saulsberry alleges it was common for officers assigned to the Centers to bring books. Doc. 86-27 ¶ 46; Doc. 86-28 at 109–12.

### d. Alleged Comparators

Saulsberry alleges three white officers engaged in similar conduct but were not disciplined or terminated.[14] Saulsberry contends Strickland and Medico are similarly situated because their incident reports had incorrect times, and they also had personal cell phones and ear buds that day. Doc. 86-27 ¶¶ 41, 45; see Doc. 88 at 15–16.

The other alleged comparator is Deputy Kimberly Krause. Eight days earlier, the same inmate left her room while Krause was on duty. See Doc. 81 at 17; Doc. 80-1 at 47–48. On that day, the inmate twice left the room and entered the area where Krause was stationed. See Doc. 80-1 at 47–48. The Centers had instructed the door where Krause was stationed be unlocked. Id. Both times, Krause had the inmate return to the room. Id.

---

[14] Saulsberry alleges a Black officer, Alesia Chisholm, was involved in similar conduct without being terminated. Doc. 88 at 11; Doc. 86-28 at 69. Even if true, it would not support race discrimination claims because Chisholm is also Black. Saulsberry alleges other officers engaged in similar behavior but lacks detail, including their names, and they therefore do not support her race discrimination allegations. See Doc. 88 at 11.

9

## II.   ANALYSIS

### D. Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Further, the Court will construe evidence in the light most favorable to Saulsberry. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014). Even so, the Court is not required to consider implausible inferences and may disregard testimony that is contradicted by a valid recording. See Brooks v. Miller, 78 F.4th 1267, 1278 (11th Cir. 2023) (directing courts to disregard testimony that is "completely and clearly contradict[ed]" by a valid recording); see also Mize v. Jefferson City Bd. of Ed., 93 F.3d 739, 743 (11th Cir. 1996) ("A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'") (quotation and citation omitted).

### E. Failure to Promote

Saulsberry brings failure to promote claims under the Equal Protection Clause and 42 U.S.C. § 1981.[15]   Race discrimination claims under the Equal

---

[15] Plaintiff is no longer pursuing the failure to promote claims under Title VII and FCRA (Counts I and II), only under the Fourteenth Amendment (Count

10

Protection Clause and § 1981 use the same legal standards and framework as claims under Title VII. Cf. Bryan v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009). In the failure-to-promote context, Title VII requires showing: (1) the plaintiff belongs to a protected class; (2) she applied for and was qualified for a promotion; (3) she was rejected despite her qualifications; and (4) other equally or less-qualified employees outside her class were promoted. Brown v. Ala. Dept. of Transp., No. 09-15509, 597 F.3d 1160, 1174 (11th Cir. 2010)).

Saulsberry was one of thirty-nine people on the list for promotion to sergeant, and one of thirty-five not promoted. She argues race discrimination was a factor because she had more experience and education than the two white employees promoted, Konopinski and Land. The record does not contain demographic information for the other thirty-four not promoted, or information about their qualifications, but it does establish the two others promoted (half of the promotions) were Black, Donely and Grimes.

Saulsberry's argument that she was more qualified reflects her own assessment rather than the required qualifications. Saulsberry did have more formal education and experience than either Konopinski or Land, but the job description did not require a four-year degree, and it did not express a preference for additional experience or education. Even if more education and

---

III) and Section 1981 (Count IV).

11

experience would generally be helpful, Saulsberry still had a hurdle to promotion because the Sheriff required supervisor recommendations.

It is undisputed that Konopinski and Land were recommended by their supervisors and Saulsberry was not. And, there is no evidence that the lack of supervisory recommendation was based on Saulsberry's race. Thus, the lack of a supervisor recommendation is a legitimate reason Saulsberry was not promoted, and Saulsberry is not entitled to substitute her business judgment for that of her employer. Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (stating "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer."). Saulsberry's argument is merely a quarrel with the wisdom of her employer, and this is not sufficient to defeat summary judgment. Id.

Accordingly, summary judgment is due to be granted on the failure to promote claims.[16]

### F. Termination

To establish a prima facie case of race discrimination, Saulsberry must show: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was treated

---

[16] In light of the Court's decision, it is not necessary to address whether requirements for a Monell claim have been met. See Doc. 81 at 21, Doc. 88 at 22.

12

less favorably than a similarly situated individual outside her protected class. Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell Douglas, 411 U.S. at 802).[17] To satisfy the fourth element, the alleged comparator must be "similarly situated in all material respects." Lewis v. City of Union City, 918 F.3d 1213, 1224 (11th Cir. 2019). A similarly situated comparator will ordinarily have (1) engaged in the same behavior; (2) been subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history. Id. at 1227-28.

Saulsberry's arguments about her termination again boil down to an argument that white comparators were treated more favorably. The evidence, even viewed in the light most favorable to her, at best shows others engaged in some of the same violations, but not all three in a single incident. The investigation concluded Saulsberry was inattentive, falsified records, and had unauthorized reading material. There alleged violation by comparators involved different circumstances and no comparator had a similar accumulation of violations.

---

[17] The Court is mindful the McDonnell Douglas paradigm is an evidentiary framework that does not change the ultimate question of whether there is enough evidence to establish illegal discrimination. Tynes v. Fla. Dept. of Juv. Just., 88 F.4th 939, 941 (11th Cir. 2023).

13

Saulsberry compares herself to Krause, because the same inmate left her room twice while Krause was on duty. The circumstances are different. Krause's logbook entries reflect the inmate left her room, Krause instructed her to return, and she did so. In short, Krause was aware the inmate had left the room. With Saulsberry, however, the video shows the inmate was outside her room for a minute and a half, and Saulsberry only became aware when notified by Strickland. No one else had to notify Krause the inmate had left the room and there is no evidence the inmate was gone from the room a minute and a half without being noticed. See Doc. 81 at 17.

The Sheriff stated Saulsberry's conduct was problematic not only because the inmate left her room, but because Saulsberry was distracted—by having earbuds in and her head down. In a single hour, she left her station twice, for several minutes, and did not maintain her observation of the inmate. See Doc. 91 at 2. Saulsberry admits she had her personal cell phone, earbuds, and a Bible, but she argues having these items were commonplace when assigned to the Centers, and others did the same thing—including Medico and Strickland. See Doc. 86-27 ¶ 43, 45. Even if others also had earbuds, personal cell phones, and reading material, there is no indication use of those items interfered with their assigned duties or observing an inmate, as it did with Saulsberry.

Saulsberry argues that incident reports from Medico and Strickland also had incorrect time entries, but they were not disciplined. Strickland and

14

Saulsberry had the time wrong by about twenty-five minutes, but Medico was off by more than twelve hours. Saulsberry's report, however, was wrong about more than just the time. Saulsberry's incident report claims she heard the door click, realized the inmate was out, and then was notified by Strickland. The video indicates Saulsberry was not aware of the problem until Strickland came in. Moreover, Saulsberry's logbook entry indicated she notified Phillips, but it was Nelson. The Sheriff attaches more significance to the mistakes Saulsberry made in her report and logbook, because they were viewed as trying to minimize the severity of misconduct. Doc. 91 at 3.

None of the suggested comparators are sufficiently similarly situated because neither the individual violations nor cumulative misconduct are similar.

Alternatively, Saulsberry argues there is a "convincing mosaic" of discrimination because she was "denied promotion and subjected to more rigid supervision, investigation and termination." Doc. 88 at 18. Even though Saulsberry admits to leaving her station, having her Bible, earbuds, and personal cell phone while on duty, she claims she did not violate any policy or procedure. See Doc. 88 at 10.

Essentially, she argues termination was too severe a consequence for the incident because the inmate was not able to escape the facility. See Doc. 86-27 ¶¶ 27–28. When the inmate left the room, she gained access to a secure hallway

15

but could not exit the facility. See id. ¶ 28; Doc. 88 at 5. This too reflects a disagreement with her employer's business judgment, and is not enough to create a convincing mosaic that Saulsberry's race played a role in her termination. Cf. Jenkins v. Nell, 26 F.4th 1243, 1250-51 (11th Cir. 2022) (reversing summary judgment for defendant–employer and finding a convincing mosaic based on disparate discipline, race–based comments, large number of departures of white operators after new manager, and additional evidence).

Summary judgment is due to be granted on Saulsberry's race discrimination claims related to her termination.

Accordingly, it is hereby

**ORDERED:**

1. Defendant's Motion for Final Summary Judgment, Doc. 81, is **GRANTED**. The Clerk should enter judgment in favor of Defendant Billy Woods and against Plaintiff Velvet Ann Saulsberry.

2. The Clerk is directed to close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 10th day of December, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

ddw
Copies:

Counsel of record